## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 10-21951-CIV-TORRES

Consent Case

JESUS CABRERA JARAMILLO, in his individual
capacity and in his capacity as the personal
representative of the estate of Alma Rosa
Jaramillo; Jane Doe, in her individual capacity,
and John Doe, in his individual capacity, and in
their capacity as the personal representatives
of the estate of Eduardo Estrada,

      Plaintiffs,

v.

CARLOS MARIO JIMÉNEZ NARANJO, also
known as "Macaco," "El Agricultor," "Lorenzo
González Quinchía," and "Javier Montañez,"

      Defendant.

_____/

## ORDER ON DEFENDANT'S
## MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

This matter is before the Court on Defendant Carlos Mario Jiménez Naranjo's

("Defendant") Motion to Dismiss Plaintiffs Jesus Cabrera Jaramillo, Jane Doe, and

John Doe's (collectively, "Plaintiffs") Amended Complaint [D.E. 91].   The Court has

considered Defendant's motion [D.E. 91], Plaintiffs' response [D.E. 93], hearing [D.E.

97], and pertinent portions of the record.   For the reasons that follow, Defendant's

Motion to Dismiss Plaintiffs' Complaint is **GRANTED IN PART** and **DENIED IN**

**PART**.

## I. BACKGROUND

Plaintiffs bring this action against Defendant pursuant to the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, and the Torture Victim Protection Act ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 (Historical and Statutory Notes)) for torts committed in Colombia that violate international law. [D.E. 91]. According to the Amended Complaint, the allegations of which we assume are true for purposes of this motion, Plaintiffs and Defendant are citizens of Colombia. [D.E. 91 at ¶¶ 10, 13, 14, 15, 16, 17]. Plaintiffs are from the Middle Magdalena River region of northwest Colombia that was occupied by Colombian paramilitaries called Bloque Central Bolivar ("BCB"), a division of the United Self-Defense Forces of Colombia ("AUC"). *Id*. at ¶¶ 13-17, 27. Defendant was a high commander of BCB from about 2000-2005. *Id*. at ¶ 27.

Paramilitary groups were introduced and used by the Colombian government to fight guerilla groups causing civil unrest in areas including the Middle Magdalena River region. *Id*. at ¶ 19. These groups were consolidated into the AUC in 1997 and given support of the Colombian army and local government officials. *Id*. at ¶¶ 20, 22. The AUC infiltrated areas in the country where the Colombian government had limited or no state presence. *Id*. at ¶ 22. The AUC received tangible benefits from the Colombian government, like transportation, munitions, and communications, and it funded itself through the production, sale, and trafficking of narcotics. *Id*. at ¶¶ 22, 23. From about 1997 to 2007, the AUC attacked civilian populations throughout Colombia, including the Middle Magdalena River region. *Id*. at ¶ 21.

Particularly in the Middle Magdalena River region, the BCB controlled local farms, municipalities, and the selection of mayors, judges, and directors of public hospitals. *Id.* at ¶ 28. The BCB influenced control through corruption, torture, kidnapping, and extrajudicial killings. *Id.* To control the drug trade, the BCB targeted members of the Program for Peace and Development ("PDP"), a non-governmental organization that provides farmers with alternatives to coca cultivation. *Id.* at ¶¶ 2, 22. The BCB murdered 27 PDP leaders between 1997 and 2009. *Id.* at ¶ 31.

As part of the Colombian government's efforts for peacemaking, Colombia called for a formal AUC ceasefire and agreement to disband in 2005. *See* Jose E. Arvelo, Note, *International Law and Conflict Resolution in Colombia: Balancing Peace and Justice In the Paramilitary Demobilization Process*, 37 Geo. J. Int'l L. 441, 413 (2006). The Colombian government established a Justice and Peace Process to offer incentives for paramilitaries to give up their arms in exchange for criminal sentencing leniency and provide victims and their families with redress. *Id.* at 413-14.

### A. *Plaintiffs*

Plaintiffs seek compensatory and punitive damages for torts in violation of international and domestic law under the ATS and the TVPA. [D.E. 91 at ¶¶ 4, 7]. The decedents were members of the PDP, the non-governmental organization that was targeted by the BCB. *Id.* at ¶¶ 13, 15. Specifically, Jane Doe and John Doe are the beneficiaries of the Estate of Eduardo Estrada and seek to recover for extrajudicial killing, war crimes, and crimes against humanity. *Id.* at ¶¶ 16, 17. The beneficiaries of the Estate of Alma Rosa Jaramillo bring action for torture, cruel, inhuman or

degrading treatment or punishment, extrajudicial killing, war crimes and crimes against humanity. *Id*. at ¶ 14.

Plaintiffs sought legal remedies against Defendant through the Justice and Peace Process, but Defendant's extradition to the United States for other crimes stopped the process. *Id*. at ¶ 3. Plaintiffs contend Defendant is amenable to suit only in the United States. *Id*.

### B.   *Defendant*

From the BCB's inception in 2000 until it disbanded in 2005, Defendant was the high commander of the BCB. *Id*. at ¶ 11. Defendant maintained and exercised command and control over his paramilitary forces in the BCB at all relevant times. *Id*. at ¶ 12. In 2008, Defendant was extradited to the United States, and subsequently he was indicted on drug-related criminal charges in the United States District Court for the Southern District of Florida and the United States District Court for the District of Columbia. *Id*. at ¶¶ 8, 10. He is currently serving a thirty-three year prison sentence at the Miami Federal Detention Center. *Id*. at ¶ 10.

### C.   *Procedural History*

Plaintiffs brought suit against Defendant on June 14, 2010. [D.E. 1]. Defendant moved to dismiss, but the Court stayed the motion pending the resolution of the ATS issue in *Kiobel v. Royal Dutch Petroleum Co.*, 133 S.Ct. 1659 (2013). [D.E. 74]. Plaintiffs filed an Amended Complaint to address the Supreme Court's ruling while alleging extrajudicial killing, torture, cruel, inhuman or degrading treatment or

punishment, war crimes, and crimes against humanity against the Defendant in his capacity as a leader of the BCB.  [D.E. 91].

The Defendant moved to dismiss the Amended Complaint on the grounds that the Court lacks personal jurisdiction over the Defendant, the ATS claims lack subject matter jurisdiction, and the Amended Complaint fails to state a claim of relief plausible on its face.  [D.E. 92].  Plaintiffs responded [D.E. 93].  The Court held oral argument on the motion. [D.E. 97].

## II.   ANALYSIS

### A.   *Personal Jurisdiction*

"Tag" or "transient" jurisdiction is a form of personal jurisdiction based only on a defendant's physical presence in the forum when served with process.  Paul R. Dubinsky, *Is Transactional Litigation a Distinct Field? The Persistence of Exceptionalism in American Procedural Law*, 44 Stan. J. Int'l L. 301, 328 (2008). Courts have found that personal service under Fed.R.Civ.P. 4(e)(2) comports with the personal jurisdiction requirements of due process. *See, e.g., Kadic v. Karadzic*, 70 F.3d 232, 248 (2d Cir. 1995) (recognizing personal jurisdiction over a foreign defendant that was sufficiently served in New York while present as an invitee of the United Nations). The pending motion seeks to reconsider that line of cases given intervening Supreme Court precedent that has taken a dimmer view of over-expansive exercise of personal jurisdiction.

The seminal and controlling case on this unique form of personal jurisdiction is *Burnham v. Superior Court of California, Cnty. Of Marin*, 495 U.S. 604 (1990).  The

case concerned service of process on a New Jersey defendant while temporarily present in California.  *Id*.  The plurality opinion upheld the exercise of "jurisdiction based on physical presence alone constitutes due process because it is one of the continuing traditions of our legal system that define the due process standard of traditional notion of fair play and substantial justice."  *Id*. at 619 (quotations omitted).  Since then, tag jurisdiction has been recognized to be a sui generis form of jurisdiction that was an exception to "traditional notions of fair play," "minimum contacts analysis," or the particular requirements of specific versus general jurisdiction.

Here, Defendant is a Colombian citizen serving a thirty-three year prison sentence at the Miami Federal Detention Center for drug-related crimes.  [D.E. 91 at ¶10].  Defendant was served while physically present in the state of Florida .  [D.E. 93 at 7].  Under existing tag jurisdiction theory, personal jurisdiction over Defendant is unquestionably proper.

 The pending motion, however, seeks to raise the question whether this accepted notion should be reconsidered.  This case reflects a unique situation where a defendant that  was extradited to the United States for particular crimes (drug trafficking) that are subject to extradition treaty limitations, but was then "tagged" for very distinct "crimes" in a civil suit over which the extraditing nation never approved or was even aware of at the time of the extradition.  *Burnham* does not per se extend its domestic tag jurisdiction to apply to foreign defendants, especially in foreign-cubed cases[1], which involve non-U.S. plaintiffs, non-U.S. defendants, and conduct that occurred outside of

---

[1] The term "foreign-cubed" is most commonly utilized in securities litigation.  *See Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 283 n.11 (2010).

the U.S.  That is important because, as the Supreme Court in *Daimler v. Bauman* recently noted, transnational context is important in assessing general jurisdiction over a defendant.  134 S. Ct 746, 762 (2014).

In that case, the international context of the dispute was indeed dispositive.  The petition to the Supreme Court emanated from the Ninth Circuit that upheld personal jurisdiction over Daimler, a German public stock company, in California predicated on the presence of a Daimler subsidiary in California and when the plaintiffs' alleged actions under ATS and TVPA affected a similar subsidiary in Argentina.  *Id*. at 762-763.  As specific jurisdiction was not raised in the case, the Ninth Circuit nevertheless held that general jurisdiction could lie over the foreign entity under an agency theory, where the California subsidiary acted as Daimler's agent for jurisdictional purposes and where one could attribute the subsidiary's California contacts to Daimler.  The Ninth Circuit's agency analysis derived from Circuit precedent that focused on whether the subsidiary performed services that were sufficiently "important" to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services.  Needless to say, such a speculative agency theory for general jurisdiction had never been considered or approved by the Supreme Court. *Id.*

The Supreme Court reversed and held that general jurisdiction could not lie under modern jurisdictional principles that consistently focus on specific jurisdictional anchors:  the "relationship among the defendant, the forum, and the litigation[.]" *Id.* at 758 (quoting *Shaffer v. Heitner,* 433 U.S. 186, 204 (1977)).  In particular, the Court

criticized the Ninth Circuit for not considering "risks to international comity" posed by its "expansive view of general jurisdiction." *Id.* at 752. When those risks are properly considered together with more traditional jurisdictional principles, Daimler could not be sued in California for torture allegedly committed against foreign plaintiffs that were attributed to the Daimler subsidiary in Argentina because "only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there. 'For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile[.]' " *Id.* at 752, 760 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown,* 564 U.S. ___, 131 S. Ct. 2846, 2853-54 (2011)).

At first blush, this recent and material limitation on the exercise of general jurisdiction would severely undercut the constitutional basis for tag jurisdiction over foreign defendants. Courts that have relied upon *Burnham* and tag jurisdiction theory to broadly assert jurisdiction over physically present foreign defendants have all ignored domicile status and focused on pure physical voluntary presence in a jurisdiction at the time of service. *See, e.g.*, *Kadic v. Karadzic*, 70 F.3d 232, 247 (2d Cir. 1995) (service of process on Bosnian Serb in New York while present as an invitee of the United Nations); *First American Corporation v. Price Waterhouse LLP*, 154 F.3d 16, 19 (2d Cir. 1998) (service of process on partner of a British company while in New York); *Bourassa v. Desrochers*, 938 F.2d 1056, 1057-58 (9th Cir. 1991) (service of process on Canadian citizen while in Florida).

Putting aside for a moment the constitutionally-suspect nature of tag jurisdiction for citizens or resident nationals, when applied to foreign defendants – who

after *Daimler* clearly cannot be sued here under the guise of general jurisdiction and legal fictions like agency theory – the due process violation is even more stark. It is hard to see how tag general jurisdiction can constitutionally lie for an individual who is invited to speak at the United Nations or before a joint session of Congress, or even worse for an individual who is on an international layover at Miami International Airport. In other words, given the markedly restricted limitation on future exercises of general jurisdiction, *Burnham's* foundation has been severely undermined for those types of cases going forward.

But, this is not that type of case and that is where Defendant's motion to dismiss falters. The application of international comity considerations here cut the other way because, in an extradition case, we do have the benefit of input from the foreign nation that had domiciliary jurisdiction over the Defendant. The foreign government's decision to extradite an individual is quite extraordinary. The foreign nation has considered a demand for the physical presence of a person suspected of crimes and chosen, in effect, to waive that domiciliary jurisdiction over that person. The unique nature of the extradition process, which is governed by many international treaties and bilateral agreements that apply in a given case, presents a very different circumstance that assuages any concerns over international comity and respect for jurisdictional boundaries.

Another way to look at it is that Defendant's "domicile" was forever altered by his home country's decision to extradite him. When he was transferred to the custody of United States law enforcement, the Colombian authorities understood quite well

that his physical presence and his "home" (at least until all lawful proceedings against him were concluded) would be in the United States.  Upon his arrival in the United States and until such time as his lawful presence here ended, his "domicile" for jurisdictional purposes shifted to the United States.

Therefore, when he was served with process in this unrelated civil case, he had no other domicile other than the United States.  For the time being, he is physically present and based here.  Tag jurisdiction, therefore, is available against him just like any other person whose domicile is also here.  The *Daimler* limitation on the exercise of general jurisdiction would thus have no application to him under the circumstances. And where *Burnham* remains good law (at least for now), Defendant has no basis to challenge tag jurisdiction over him and we are bound by *Burnham* to apply it in this case.  The motion to dismiss the complaint on personal jurisdiction bases must thus be Denied.

### B.   *Alien Tort Statute Claims*

The ATS gives federal courts jurisdiction over "any civil action by an alien for a tort only committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.  Yet, courts are restrained in exercising this jurisdiction, under the recent Supreme Court decision in *Kiobel v. Royal Dutch Petroleum Co.,* where the act occurred entirely outside the United States. 133 S.Ct. 1659, 1665 (2013).  In *Kiobel*, Nigerians residing in the United States brought ATS claims against foreign corporations alleging that the corporations aided and abetted the Nigerian government in committing violations of the law of nations that occurred in Nigeria.  *Id.* at 1661-63.

The Supreme Court found that claims under the ATS are not intended to have an extraterritorial reach. *Id.* at 1669. Any claim brought under the jurisdiction of the ATS has a presumption against extraterritoriality, or is limited if brought by foreign nationals against other foreign nationals for violations committed outside of the United States. *Id.*

The presumption against extraterritoriality derives from a cannon of statutory interpretation that reflects the "presumption that United States law governs domestically but does not rule the world." *Id.* at 1664 *(*quoting *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454 (2007)). The presumption applies to guard "against our courts triggering . . . serious foreign policy consequences, and instead defers such decisions, quite appropriately, to the political branches." *Id.* After a review of the historical context of the ATS, the *Kiobel* Court found that nothing "suggests that Congress also intended federal common law under the ATS to provide a cause of action for conduct occurring in the territory of another sovereign." *Id.* at 1668-69.

The Supreme Court found that the presumption may be displaced if the claims touch and concern the United States "with sufficient force", but there was no mention of what may constitute "sufficient force." *Id.* at 1669. Because all the relevant conduct occurred outside of the United States and mere corporate presence in the United States is not a sufficient force to displace the presumption against extraterritorial application, the ATS claims were barred. *Id.*

Following *Kiobel*, lower courts have now "consistently rejected ATS claims where all the relevant conduct occurred abroad." *Mamani v. Berzain*, Nos. 07-22459-CIV-

COHN, 08-21063-CIV-COHN, 2014 WL 2069491, at *9 (S.D. Fla. May 20, 2014); *Chen Gang v. Zhao Zhizhen*, No. 04-CV-1146, 2013 WL 5313411, at *3 (D. Conn. Sept. 20, 2013) (citing cases where ATS claims based on extraterritorial conduct were barred); *cf. Ahmed v. Magan*, No. 2:10-CV-00342, 2013 WL 4479077, at *2 (S.D. Ohio Aug. 20, 2013) (displacing presumption because the defendant was a lawful permanent resident); *Sexual Minorities Uganda v. Lively*, 960 F. Supp. 2d 304, 321-23 (D. Mass. 2013) (displacing presumption because the defendant was an American citizen and the alleged tortuous conduct occurred "substantially" in the United States); *Mwani v. Laden*, 947 F. Supp. 2d 1, 2 (D.D.C. 2013) (displacing presumption because the actions involved terrorist activities directed at the United States Embassy and its employees).

The Court must reject Plaintiffs' ATS claims because all the relevant conduct occurred abroad.  Plaintiffs cannot overcome *Kiobel*'s heavy presumption against extraterritorial applicability.  Plaintiffs plead extrajudicial killings, tortures, cruel, inhuman or degrading treatments or punishments, war crimes, and crimes against humanity that all occurred entirely in Colombia.  Furthermore, the alleged conduct was directed towards people living in Colombia because of politics and armed conflict there.

The claims alleged in the complaint thus do not touch and concern the United States with "sufficient force."  Plaintiffs rely on *Ahmed* and *Lively* to maintain to the contrary. [D.E. 93 at 7].  But in *Ahmed*, the district court found the presumption was overcome because the defendant was a lawful permanent resident.  *See Ahmed*, 2013 WL 4479077, at *2.  By contrast, although the Supreme Court in *Kiobel* did not define precisely what would constitute sufficient force, the mere fact that Defendant is

currently imprisoned in the United States is plainly insufficient to displace the presumption against extraterritoriality. *See Mamani*, 2014 WL 2069491, at *10 (citations omitted). As *Mamani* notes, "many courts have found in the wake of *Kiobel* that a defendant's presence or residence in the United States at the time of the litigation . . . does not displace the *Kiobel* presumption." *Id.* Also, as Judge Cohn reasoned in *Mamani*, it is difficult "to attach any meaningful weight to the magistrate judge's opinion (in *Ahmed*), which made no effort to come to grips with the relevant language in *Kiobel*." *Id.* at *10 n.14.

*Lively* also does not apply here because the court there relied on the defendant's American citizenship and the alleged tortious conduct that occurred "substantially" in the United States. *See Lively*, 960 F. Supp. 2d at 321-23. But here those relevant factors are not present. And the current status of Defendant is irrelevant in analyzing where the alleged conduct took place. *See Kiobel*, 133 S. Ct. at 1668; *Balintulo v. Daimler AG*, 727 F.3d 174, 190 n.24 (2d Cir. 2013).

As a result, the *Kiobel* presumption against extraterritoriality remains intact when all relevant conduct transpired on foreign soil by foreign actors. *See, e.g., Mamani,* 2014 WL 2069491, at *11. The presumption precludes Plaintiffs from bringing claims that occurred entirely within Colombia against Defendant under the ATS. The additional facts alleged in the complaint that Plaintiffs and Defendant are Colombian nationals that were engaging in an internal conflict strengthens the view that the presumption is not displaced because the relevant acts do not touch and concern the United States with sufficient force. Therefore, Plaintiffs' claim that

Defendant violated the law of nations for extrajudicial killing, torture, cruel, inhuman or degrading treatment or punishment, war crimes, and crimes against humanity under the ATS must be dismissed.  [D.E. 91 ¶¶ 65, 74, 82, 89, 97, 104, 110, 116].

The Court's analysis could stop there.  But we must add that, in the intervening period following briefing and oral argument, the Eleventh Circuit has decided additional cases that fully support Defendant's position.  In *Cargona v. Chiquita Brands Int'l, Inc.,* No. 12-14898 (11th Cir. July 24, 2014), the Eleventh Circuit expressly followed *Kiobel* in dismissing a case brought against a domestic corporation under the ATS and the TVPA that alleged that the defendant engaged in "concert of action with paramilitary forces in Colombia" (just like those at issue here) that resulted in torture, personal injury, and death.  The Eleventh Circuit focused on the fact that none of the relevant tortious conduct took place within the United States, relying upon *Kiobel's* admonishment that "even where the claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application." *Id.* at 10.

Significantly, the panel's decision was followed by a dissenting opinion from Judge Martin.  The dissent claimed that ATS jurisdiction could lie because the corporate defendant's contacts with the forum were sufficient to touch and concern the United States.  The majority opinion, however, rejected that argument because "[t]here is no allegation that any torture occurred on U.S. territory, or that any other act constituting a tort in terms of the ATS touched or concerned the territory of the United

States with any force." *Id.*  The missing territorial connection between the wrongful conduct and the United States was pivotal.

By that measure, the decision here is far less remarkable.  No domestic party is alleged to be involved in the case in any way during the relevant time period.  The only contention that Plaintiffs rely upon to tenuously allege that the presumption is displaced stems from Defendant's conduct having some connection to the importation of drugs to the United States.  Plaintiffs conclude that their claims touch and concern the United States because the victims were opposed to Colombian drug exporters and their activities.  Yet the torts alleged in the Amended Complaint occurred entirely in Colombia by a Colombian Defendant concerning Colombian affairs, which is by any reasonable measure insufficient to displace the presumption against extraterritoriality, especially when compared to the far greater connections cited, but still rejected, in *Chiquita.*  In other words, if an argument like this one did not overcome the presumption in a case involving tortious conduct tied to a domestic entity, that argument must fail in a case where no domestic entity is ever involved.

Any lingering doubt about this conclusion was then put to rest by the Eleventh Circuit's recent published decision in another ATS case, *Baloco v. Drummond Co., Inc.,* No. 12-15268 (11th Cir. Sept. 23, 2014).  That case involved even more analogous allegations of torture and murder committed by paramilitary forces "of the AUC, an organization affiliated with Colombia's military and which, together with the military, provided security against guerilla attacks for [defendant's] coal mining facility and operations.  Plaintiffs claim that the murders occurred in the context of a violent armed

conflict between the AUC and the FARC, a leftist guerilla organization; hence, they classify the murders as war crimes." *Id.* at 2-3.  Notably, these are the very same type of claims alleged in this complaint. [D.E. 93 at 13 ("[Defendant] remains here having pleaded guilty to crimes of narco-terrorism that involved using force and violence, including against Plaintiffs' relatives, to aid his drug trafficking from Colombia to the United States.  Defendant had the Decedents tortured and killed because they supported anti-coca cultivation efforts that threatened the interests of the AUC.") (citing Am. Compl. ¶¶ 2, 13, 15, 30-33, 38-42, 46-51, 54, 56, 60)].

The Eleventh Circuit, however, affirmed the dismissal of the claims under the ATS because "the extrajudicial killings and war crimes asserted in the [complaint] occurred in Colombia." *Id.* at 9.  In response to the theory that the claims touched and concerned the United States because U.S. nationals were allegedly involved in the decision-making and approval for AUC agents to conduct the Colombia killings, the Court rejected that argument because "the issue is not whether the murders 'touch and concern' the United States, as Plaintiffs suggest, but rather whether the murders 'touch and concern the *territory* of the United States.' " *Id.* at 11 (quoting *Kiobel,* 133 S. Ct. at 1669 (emphasis in original)).

Both *Chiquita* and *Baloco* included allegations that tried to tie the wrongful acts to interests of the United States (either involving domestic actors engaged in approval of extra-judicial killings abroad or foreign actors motivated by monetary gain from United States markets).  Those unsuccessful attempts at ATS jurisdictional ties are materially stronger or at least equivalent to the Plaintiffs' efforts here.  Yet, the

Eleventh Circuit firmly came down on the side of a narrow reading of post-*Kiobel* ATS jurisdiction that focused primarily on the territorial location of the alleged wrongful killings.  In both cases, there was no dispute that the wrongful conduct was based entirely in Colombia.  That undeniable fact resulted in the dismissal of both actions. We see no intellectually honest reason why the same result should not follow here. There is no choice but to apply the presumption against extra-territoriality given the allegations in this complaint, which involve Colombian actors engaged in Colombian murders against Colombian victims to further Colombian interests.  And, the fact that United States interests are certainly involved, those tangential interests are wholly insufficient to overcome the extra-territorial nature of the crimes alleged.  Under *Kiobel,* as illustrated by *Chiquita* and now *Baloco,* these ATS claims must fail.

### C.     *Torture Victim Protection Act Claims*

Defendant also asserts that the TVPA claims in the Amended Complaint are not sufficiently pleaded.  [D.E. 92].[2]  A well-pleaded complaint will survive a motion to dismiss "even if it strikes a savvy judge that actual proof of these facts is improbable, and that a recovery is very remote and unlikely."  *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007) (citation omitted).    However, "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal."  *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).  The Court must view the allegations in the complaint as true and in a light most

---

[2]     Although the Motion to Dismiss does not specify whether the TVPA or the ATS should be dismissed for failure to state a claim, it broadly requests the Amended Complaint be dismissed because it does not sufficiently allege that "Jimenez acted unlawfully against Plaintiffs." [D.E. 92 at 3].

favorable to the plaintiff. *See Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 164 (1993); *Watts v. Florida Int'l Univ.,* 495 F.3d 1289, 1295 (11th Cir. 2007).

While the ATS and TVPA share the same purpose, civil suit mechanism, location within the United States Code, *see Papa v. United States*, 281 F.3d 1004, 1012 (9th Cir. 2002), and statute of limitations, *see Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1153 (11th Cir. 2005), they mainly differ in what kind of claims may be brought.[3] *Compare* Alien Tort Statute, 28 U.S.C. § 1350, *with* Torture Victim Protection Act, 106 Stat. 73. Specifically, only claims for extrajudicial killing and torture may be brought under the TVPA.[4]

To plead a TVPA claim, a plaintiff must allege with specificity that the defendant, while under actual or apparent authority and/or color of law of a foreign nation, committed extrajudicial killing or torture. The remedies must not be exhausted in the place that the conduct occurred, and the statute of limitations must not have passed. A plaintiff's failure to plead any of the elements of a TVPA claim results in a

---

[3]    Other differences between the TVPA and ATS include how each defines torture and extrajudicial killing as well as how the TVPA allows United States citizens and aliens to recover for torture and extrajudicial killing. *Baloco ex rel. Tapia v. Drummond Co., Inc.*, 640 F.3d 1339, 1347 (11th Cir. 2011). The TVPA also requires an express element of state action. *Id.*

[4]    The TVPA does not provide the exclusive remedy for extrajudicial killing and/or torture; a separate claim may be brought for extrajudicial killing and/or torture under the ATS. *See Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1251 (11th Cir. 2005) (recognizing torture claims under both the TVPA and ATS). But unlike an ATS claim, the TVPA has a separate jurisdictional basis that is not implicated by *Kiobel. See Kiobel,* 133 S. Ct. at 1669 (Kennedy, A., concurring) (Court's majority opinion has no application to claims under the TVPA).

failure to state a claim upon which relief can be granted.  *See Sinaltrainal v. Coca-Cola*, 578 F.3d 1252, 1269-70 (11th Cir. 2009), abrogated on other grounds by *Mohamad v. Palestinian Authority*, 132 S.Ct. 1702 (2012); *Romero v. Drummond Company, Inc.*, 552 F.3d 1303, 1315 (11th Cir. 2008).  The Court must consider each element of the TVPA extrajudicial killing and torture claims to assess if (1) under actual or apparent authority, or color of law, of any foreign nation, Defendant is (2) secondarily liable for (3) extrajudicial killing, (3) torture, and (4) whether the remedies have been exhausted. Only if each element is sufficiently and plausibly pleaded will a TVPA claim survive review on a Rule 12(b)(6) motion to dismiss.

### *1.  Color of Law*

A TVPA action may be brought by non-citizens against "an individual who, under actual or apparent authority, or color of law, of any foreign nation–subjects an individual to torture" or "subjects an individual to extrajudicial killing." Torture Victim Protection Act, § 2(a).  An individual acts under color of law when actions are made together with state officials or with significant state aid.  *See Sinaltrainal v. Coca-Cola*, 578 F.3d at 1264;  *Khulumani v. Barclay Nat'l Bank Ltd*, 504 F.3d 254, 260 (2d Cir. 2007).  In interpreting the state action requirement, the Eleventh Circuit has relied on

"the principles of agency law and to jurisprudence under 42 U.S.C. § 1983."[5]  *Aldana*, 416 F.3d at 1247 (internal citation omitted).

There is no bright line rule for distinguishing between state action and purely private conduct.  "Only in rare circumstances can a private party be viewed as a '[s]tate actor' for section 1983 purposes."  *Rayburn ex rel. Rayburn v. Hogue*, 241 F.3d 1341, 1347 (11th Cir. 2001) (quoting *Harvey v. Harvey*, 949 F.2d 1127, 1130 (11th Cir. 1992)). When a claim requiring state action is based on conduct by a private actor, "there must be proof of a symbiotic relationship between a private actor and the government that involves the torture or killing alleged in the complaint to satisfy the requirement of state action."  *Romero v. Drummond Co.,* 552 F.3d at 1317; *see also Sinaltrainal*, 578 F.3d at 1266 ("We demand allegations of a symbiotic relationship that involves the torture or killing alleged in the complaint to satisfy the requirement of state action.") (quotation and citation omitted); *Rayburn ex rel. Rayburn*, 241 F.3d at 1348 ("The Supreme Court has indicated that the symbiotic relationship must involve the specific conduct of which the plaintiff complains.") (quotation and citation omitted).

The Eleventh Circuit in *Sinaltrainal,* for instance, found that the plaintiffs failed to sufficiently plead that paramilitary forces in Colombia were state actors or sufficiently connected to the Colombian government to claim they were acting under

---

[5]      The Supreme Court in *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, identified several theories for finding color of law in a § 1983 action: whether the conduct resulted from the state's coercive power, whether the state provided significant encouragement, whether the private actor operated as a willful participant in joint activity with the state, whether the private actor is controlled by an agency of the state, whether the private actor was delegated a public function, and the degree of public entwinement between the state and the private actor.  531 U.S. 288, 296 (2001).

color of law.  *See Sinaltrainal v. Coca-Cola*, 578 F.3d at 1270.  In *Sinaltrainal*, "[m]ere toleration of the paramilitary forces does not transform such forces' acts into state acts; moreover there are no allegations the Colombian government was aware of, much less complicit in, the murder and torture . . . allege[d]." *Id.* (internal citation omitted). Despite extensive allegations that the Colombian government cooperated, assisted, and worked in concert with the paramilitaries, the Court found that because the plaintiff did not connect the state action to the act of killing and torture alleged in the complaint, the TVPA color of law element was not satisfied.  *See id.* ("The plaintiffs' conclusory allegations that the paramilitary security forces acted under color of law is not entitled to be assumed true and is insufficient to allege state-sponsored action.")*; see also Romero v. Drummond Co.,* 552 F.3d at 1317-18 (finding the proof of a general relationship between the AUC and the Colombian government was "not enough" to establish state action because the state action was not linked to the "murders described in the complaint".).

The Amended Complaint as a whole only alleges a broad, general relationship between the AUC/BCB and the Colombian government.  For example, paragraph twenty-seven of the Amended Complaint alleges the Colombian government authorized the AUC to invade the Middle Magdalena River region.  [D.E. 91 ¶ 27].  Also, paragraph twenty-three generally states, "the Colombian government provided transportation, munitions, and communications to the AUC."  *Id.* at ¶ 23.  Plaintiffs even refer to the BCB as the "de facto government" for the region whose role was to infiltrate and fight

guerillas.[6] [D.E. 44, 47].  Yet, despite the Plaintiffs' allegations of a general relationship, the Eleventh Circuit requires that the Plaintiffs must plausibly establish a direct a link between a government and the alleged extrajudicial killings and tortures.

As a result, we must look more closely to the specific allegations of each Plaintiff included in the Amended Complaint.

(a)   *Eduardo Estrada and Jane Doe*

Plaintiffs Eduardo Estrada (by and through John Doe as personal representative) and Jane Doe rely on a symbiotic relationship between the BCB and a Colombian government for their claims.  On July 16, 2001, Estrada and Jane Doe were returning from a party close to their home when Estrada was shot three times in the head by Defendant's subordinate.  [D.E. 91 at ¶ 34].  Jane Doe briefly lost consciousness after witnessing the shooting to find the subordinate standing over her with a gun.  *Id.* at ¶ 35.  Paragraph thirty-six of the Amended Complaint provides: "Eduardo Estrada was shot approximately 300 meters from the local police station, yet the local police did not assist him. Government soldiers also passed and offered no help."  *Id.* at ¶ 36.

According to the Eleventh Circuit in *Aldana*, the proximity of the actions to a police station is not suggestive of state involvement.  *See Aldana,* 416 F.3d at 1248 ("[P]olice inaction . . . at least one hundred meters . . . away, does not establish state

---

[6]      Plaintiffs allege that Defendant, as commander of the AUC and BCB, "had a duty under customary international law, multilateral treaties and Colombian law to ensure the protection of civilians".  [D.E. 47]. The Court concludes there are not sufficient allegations to suggest the Colombian government recused itself as the national government of the Middle Magdalena River region to effectively have the AUC and BCB be the "de facto government" and the actions that the paramilitary organization commits would be considered state actions.

action."). But the allegation that government soldiers offered no help when they passed shows a symbiotic relationship because it could reflect the government purposefully not participating to stop any abuse or aid victims of BCB. *See id.* ("This lack of state action is particularly definite where . . . [p]laintiffs do not allege sufficient facts to warrant the inference that the National Police knew of and purposefully turned a blind eye to the events."). In drawing inferences in Plaintiffs' favor, the Amended Complaint offers enough details to suggest the government officials turned a blind eye on the acts of Defendant's subordinate during the time of Eduardo Estrada and Jane Doe's claims. Therefore, we find that there are sufficient pleaded facts, if ultimately proven, to establish satisfy the color of law element for these particular Plaintiffs, at least sufficient enough to allow the lawsuit to proceed to the next phase of the case.

   *(b)    Alma Rosa Jaramillo*

   On the other hand, the representative of Plaintiff Alma Rosa Jaramillo does not sufficiently plead a direct or symbiotic relationship between the government and the BCB to link the government to her killing. The Amended Complaint states that Jaramillo worked for a mayoral candidate that ran against a BCB candidate in 2000. [D.E. 91 at ¶ 39]. In the months after the October 2000 election, Jaramillo discovered that a BCB sympathizer and city councilman named Manuel Payares had informed the BCB that Jaramillo was a guerrilla collaborator. *Id.* She denied the accusations to the BCB and filed a slander suit against Payares in early 2001. *Id.* Around March 2001, Jaramillo received a death threat and was ordered to leave town by a BCB soldier. *Id.* at ¶ 40. Around June 28, 2001, she was abducted from a vehicle by BCB, and around

July 1, 2001, only her torso was recovered from a river, which displayed signs indicative of torture.  *Id.* at ¶¶ 41, 42.

The Amended Complaint, however, does not plead sufficient facts to connect the actions of the city councilman, a state actor, with the torturing and killing of Jaramillo by the BCB.  The facts pleaded reveal that the sequence of events could easily be mutually exclusive and Jaramillo was killed because of her involvement in the PDP or in the campaign against a BCB candidate.  When reading paragraphs thirty-nine through forty-two together, it is impossible to infer that the city councilman had a direct involvement in her torture and killing, thereby precluding satisfaction of the color of law element in her case.

"We must make reasonable inferences in [p]laintiffs' favor, but we are not required to draw [p]laintiffs' inference."  *Aldana*, 416 F.3d at 1248.  Following Eleventh Circuit precedent, absent any factual allegations to support the legal conclusion that any government in Colombia had more than a general relationship with BCB, an allegation of state action or color of law is not plausible on its face.  *See Romero v. Drummond Co.,* 552 F.3d at 1317-18;  *Sinaltrainal v. Coca-Cola*, 578 F.3d at 1270.  There is not a sufficient connection pleaded in the amended complaint to show the city councilman was involved, directly or materially, in the torture or murder alleged in the complaint.  Because the color of law element has not been satisfied, Alma Rosa Jaramillo has no claim under the TVPA as a matter of law.  Alma Rosa Jaramillo must be dismissed from the suit on this basis.

## 2.   *Secondary Liability*

The Court next considers whether Defendant is liable for the extrajudicial killings under the doctrine of command responsibility for the remaining Plaintiffs.[7] The TVPA allows victims or their representatives to bring a civil action against commanders under the international law doctrine of command responsibility.  *Ford v. Garcia,* 289 F.3d 1283, 1286 (11th Cir. 2002); *see Mamani*, 2014 WL 2069491, at *16-18.  Although this doctrine is not explicitly stated in the TVPA, the Eleventh Circuit has incorporated the concept of command responsibility by relying on the statute's legislative history.  *See id*. (quoting S. Rep. No. 102-249 at 9 (1991) "responsibility for torture, summary execution, or disappearances extends beyond the person or persons who actually committed those acts anyone with higher authority who authorized, tolerated or knowingly ignored those acts is liable for them").  "An examination of legislative history indicates that the TVPA was intended to reach beyond the person who actually committed the acts, to those ordering, abetting, or assisting in the violation."  *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1157 (11th Cir. 2005); *see also Aldana*, 416 F.3d at 1248 ("The [TVPA] reaches those who ordered, abetted, or assisted in the wrongful act . . . .").

"Command responsibility" requires:

(1) the existence of a superior-subordinate relationship between the commander and the perpetrator of the crime; (2) that the commander knew or should have known, owing to the circumstances at the time, that his subordinates had committed, were committing, or planned to commit

_____

[7]    The Amended Complaint does not claim that Defendant personally committed any of the atrocities alleged or otherwise claim that he was even present at the time these acts took place.

> acts violative of the law of war; and (3) that the commander failed to prevent the commission of the crimes, or failed to punish the subordinates after the commission of the crimes.

*Ford*, 289 F.3d. at 1288.

Plaintiffs adequately connect Defendant to the killings and torture by describing his role as commander of BCB, PDP's role in the Middle Magdalena region, and BCB's overall strategy for control.  [D.E. 91 ¶ 49].  Plaintiffs allege that the killer and torturer was a subordinate of Defendant.  Also, the former head of the BCB's military wing and the former head of its political wing have testified to Defendant's knowledge of and responsibility as the BCB leader for the murders.  *Id.* at ¶ 46.  Therefore, the Amended Complaint's factual allegations plausibly suggest that Defendant is secondarily responsible for the extrajudicial killing of Estrada and the torture of Jane Doe.  *Cf. Mamani*, 2014 WL 2069491, at *16-18 (determining plaintiffs alleged facts suggesting that the former President and the former Minister of Defense are secondarily liable under the doctrine of command responsibility);  *Arce v. Garcia,* 434 F.3d 1254, 1259 (11th Cir. 2006) (jury finding the Minister of Defense and the Director General of El Salvador National Guard are liable for torture committed by their subordinate under the command responsibility doctrine).

### 3.   *Extrajudicial Killing*

Extrajudicial killing is defined under the TVPA as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples."  Torture Victim Protection Act, § 3(a).  For a deliberate killing to constitute

an extrajudicial killing, the death must be "'deliberate' in the sense of being undertaken with studied consideration and purpose." *Mamani*, 654 F.3d at 1155.

The factual allegations concerning the killing of Estrada supports the inference that his killing was deliberate enough to qualify as an extrajudicial killing. The Amended Complaint details that Estrada, a founding member of the PDP, was approached and killed by one of Defendant's subordinates as witnessed by Jane Doe, one of the Plaintiffs. [D.E. 91 at ¶ 34]. Because members of the PDP were targeted by the BCB and the BCB murdered 27 PDP leaders between 1997 and 2009, the deadly three shots to the back of Estrada's head satisfies the "deliberate" aspect of the extrajudicial killing. *See id.* at ¶ 31; *cf. Mamani*, 654 F.3d at 1155 ("even reading the well-pleaded allegations of fact in the [c]omplaint in plaintiffs' favor, each of the plaintiffs' decedents' deaths could plausibly have been the result of precipitate shootings during an ongoing civil uprising."). Viewing these allegations and the Amended Complaint in the light most favorable to Plaintiffs, the Court finds the allegations sufficient to as an initial matter to show that these killings qualified as extrajudicial killing under the statute.

### 4. Torture

The TVPA defines torture as:

(b) Torture.–For the purposes of this Act–
(1) the term 'torture' means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering . . . whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining information or a confession, punishing that individual for an act that individual or third person has committed or is suspected of having committed, intimidating or coercing that individual

or a third person, or for any reason based on discrimination of any kind; and

(2) mental pain or suffering refers to prolonged mental harm caused by or resulting from–

> (A) the intentional infliction or threatened infliction of severe physical pain or suffering;
>
> (B) the administration or application, or threatened infliction of severe physical pain or suffering;
>
> (C) the threat of imminent death; or
>
> (D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

Torture Victim Protection Act, § 3(b).

Jane Doe sufficiently pleads the elements required for a torture claim by showing she was (a) in the physical control of Defendant's subordinate; (b) suffered severe, prolonged mental and physical pain or suffering by watching a relative be shot three times and bleed to death; and (c) threatened by imminent death by having a gun pointed at her; to punish her for an act her relative has committed or to intimidate her. [D.E. 91 at ¶¶ 34, 35]. Specifically, Jane Doe is a relative of Eduardo Estrada. [D.E. 23]. When Estrada and Jane Doe were returning from a party close to their home, one of Defendant's subordinates approached them from behind and shot Estrada three times in the back of his head. [D.E. 91 at ¶ 34]. After witnessing Estrada's shooting, she briefly lost consciousness. *Id.* at ¶ 35. When she returned to consciousness, she found Defendant's subordinate standing over her with a gun, her relative bleeding to death at her side, and then the subordinate escaping on foot. *Id.* The Amended Complaint details that the subordinate "specifically intended to inflict severe pain and suffering on Jane Doe" and were committed "to punish, intimidate or coerce Jane Doe; to

discriminate against Jane Doe for her presumed political beliefs or those of her relative; and/or to intimidate or coerce third parties, including members of the PDP and individuals perceived to be opponents of the AUC/BCB's government of Middle Magdalena." *Id.* at ¶¶ 94, 95.

### 5.   *Exhaustion of Remedies*

Under section 2(b), "the court shall decline to hear a claim under this section if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred." Torture Victim Protection Act, § 2(b). Taking the Amended Complaint as true, Plaintiffs sought legal remedies through Colombia's Justice and Peace Process, but Defendant's extradition makes him amenable to suit only in the United States. [D.E. 91 ¶ 3]. Therefore, Plaintiffs have sufficiently pleaded this aspect of the TVPA claim.

* * *

Again, we do not have occasion to consider whether these claims can survive summary judgment or prevail at trial. We only find that the action cannot be dismissed in its entirety at this stage with respect to Plaintiffs Eduardo Estrada and Jane Doe given the plausible allegations included in the Amended Complaint that the Court must assume to be true. As to Plaintiff Alma Rosa Jaramillo, a different result must follow because no viable claim can proceed on her behalf due to the absence of a predicate and essential element of her claim. Her TVPA claim can proceed no further as a matter of law.

### III.   CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss [D.E. 92] is **GRANTED** in part and **DENIED** in part as follows:

1.     The Motion is Granted in so far as all ATS and TVPA claims filed by Plaintiff Jesus Cabrera Jaramillo on behalf of Alma Rosa Jaramillo are DISMISSED for lack of subject matter jurisdiction and failure to state a claim, Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

2.     The Motion is Granted in so far as any ATS claims filed by Plaintiffs Eduardo Estrada and Jane Doe are DISMISSED for lack of subject matter jurisdiction, Fed. R. Civ. P. 12(b)(1).

3.     The Motion is Denied in so far as a TVPA claim has been adequately and plausibly alleged by Plaintiffs Eduardo Estrada and Jane Doe, Fed. R. Civ. P. 12(b)(6). Defendant shall serve an answer within thirty days to those Counts of the Amended Complaint that relate to this claim.

4.     The Motion is Denied with respect to all Plaintiffs' claims on the grounds of deficient personal jurisdiction, Fed. R. Civ. P. 12(b)(2).

**DONE AND ORDERED** in Chambers, Miami, Florida, this 30th day of September, 2014.

EDWIN G. TORRES
United States Magistrate Judge