## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 10-21951-Civ-TORRES

JESUS CABRERA JARAMILLO, in his individual
capacity, and in his capacity as the personal
representative of the estate of Alma Rose Jaramillo,

SARA GONZÁLEZ CALDERON, in her individual capacity, and

ALONSO ESTRADA GUTIERREZ, in his individual capacity, and
in his capacity as the personal representative of the estate
of Eduardo Estrada,

     Plaintiffs,

v.

CARLOS MARIO JIMENEZ NARANJO, also known as
"Macaco," "El Agricultor," "Lorenzo Gonzalez Quinchia,"
and "Javier Montanez,"

     Defendant.

_____/

## ORDER ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
## OR, IN THE ALTERNATIVE, MOTION FOR FINAL DEFAULT JUDGMENT

     This matter is before the Court on Sara González Calderon's ("Mrs. Calderon") and Alonso Estrada Gutierrez's ("Mr. Gutierrez") (collectively, "Plaintiffs") motion for summary judgment or, in the alternative, motion for default judgment against Carlos Mario Jiménez Naranjo ("Defendant"). [D.E. 198]. No response was filed in opposition and the time to do so has passed. Therefore, the motion is now ripe for disposition. After careful consideration of the motion, the relevant authorities, and the record presented, Plaintiffs' motion for summary judgment is **GRANTED**.

1

# I.     BACKGROUND

This dispute arises out of the killing of Eduardo Estrada[1] ("Mr. Estrada") and the torture of his common law wife, Mrs. Calderon, for torts committed in Colombia. Plaintiffs are from the Middle Magdalena River region of northwest Colombia that was occupied by Colombian paramilitaries called the *Bloque Central Bolivar* ("BCB"), a division of the United Self–Defense Forces of Colombia ("AUC"). Defendant was a high commander of BCB from 2000 to 2005.

The Colombian government introduced and used paramilitary members to fight guerilla groups causing civil unrest in areas including the Middle Magdalena River region.  These groups were consolidated into the AUC in 1997 and given the support of the Colombian army and local government officials.  The AUC infiltrated areas in the country where the Colombian government had limited or no state presence.  The AUC received tangible benefits from the Colombian government, such as transportation and communications, and it funded itself through the production, sale, and trafficking of narcotics.  From 1997 to 2007, the AUC attacked civilian populations throughout Colombia.

In the Middle Magdalena River region, the BCB controlled local farms, municipalities, and the selection of mayors, judges, and directors of public hospitals.  The BCB influenced control through corruption, torture, kidnapping, and extrajudicial killings.  To control the drug trade, the BCB targeted members of the Program for Peace and Development ("PDP"), a non-governmental organization.

---

[1]     Mr. Gutierrez is the representative of Mr. Estrada's estate.

On July 16, 2001, Plaintiffs allege that the BCB killed Mr. Estrada in San Pablo with a bullet to the back of the head.  After the killing, Colombian state actors turned a blind eye to the crime, and law enforcement never inquired about the gunshots or the screaming on the night of the murder.  Plaintiffs now seek compensatory and punitive damages for violations of the TVPA with allegations that Defendant (1) aided and abetted BCB members, (2) participated in a conspiracy to kill civilians, and (3) exercised command responsibility.

The procedural history of the case shows that Defendant initially answered the complaint and proceeded to mount a defense through counsel of record.  But once Defendant was removed from the United States, after having served a federal prison sentence for drug trafficking offenses, Defendant abandoned his defense of the case.  This was no doubt caused by the Defendant's imprisonment, upon his return to Colombia, on murder and conspiracy charges filed against him in Colombia.  Counsel of record moved to withdraw in part due to their inability to communicate with Defendant while in Colombian custody, especially after the pandemic.  The record shows that the pending motion was served at the last known address available for Defendant while he is in custody.  But no response was filed.  The Court must thus review the record in the light most favorable to the non-moving party on summary judgment, but cognizant that Defendant has not met his burden of challenging the facts alleged by Plaintiffs in this record.  Based on that review, no genuine issues of fact remain to be tried in the case and the case can be adjudicated on summary judgment.

## II.   *APPLICABLE PRINCIPLES AND LAW*

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  On summary judgment, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.  *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 597 (1986) (quoting another source).

In opposing a motion for summary judgment, the nonmoving party may not rely solely on the pleadings, but must show by affidavits, depositions, answers to interrogatories, and admissions that specific facts exist demonstrating a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  The existence of a mere "scintilla" of evidence in support of the nonmovant's position is insufficient; there must be evidence on which the jury could reasonably find for the nonmovant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  A court need not permit a case to go to a jury when the inferences that are drawn from the evidence, or upon which the non-movant relies are

implausible.  *Mize v. Jefferson City Bd. Of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996) (citing *Matsushita*, 475 U.S. at 592-94).

At the summary judgment stage, the Court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  In making this determination, the Court must decide which issues are material.  A material fact is one that might affect the outcome of the case.  *See id.* at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.").  "Summary judgment will not lie if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

## III.  ANALYSIS

Plaintiffs seek summary judgment on the question of whether Defendant committed an extrajudicial killing and torture in violation of the Torture Victim Protection Act ("TVPA").  Plaintiffs also ask that the Court grant summary judgment on Defendant's affirmative defense with respect to the exhaustion of local remedies.  If the Court denies the motion for summary judgment, Plaintiffs request an alternative remedy for final default judgment because the factual allegations, when taken as true, establish liability as to all claims presented in the underlying complaint.  If the Court grants either the motion for summary judgment or the

motion for default judgment, Plaintiffs request compensatory and punitive damages and a substantial monetary award.

### A.    *Torture Victim Protection Act Claims*

To establish a TVPA claim, a plaintiff must show with specificity that a defendant, while under actual or apparent authority and/or color of law of a foreign nation, committed an extrajudicial killing or torture.  *See* 28 U.S.C. § 1350 ("An individual who . . . (1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative or to any person who may be a claimant in an action for wrongful death.").  The remedies must be exhausted in the place that the conduct occurred, and the statute of limitations must not have passed.  A court must consider each element of a TVPA claim to assess if (1) under actual or apparent authority, or color of law, of any foreign nation, the defendant is (2) secondarily liable for (3) an extrajudicial killing, (3) torture, and (4) whether local remedies have been exhausted.  Only if each element is established can a court grant a motion for summary judgment.

### B.    *Color of Law*

Non-citizens may bring a TVPA action against "an individual who, under actual or apparent authority, or color of law, of any foreign nation—subjects an individual to torture" or "subjects an individual to extrajudicial killing."  TVPA, § 2(a).  An individual acts under color of law when actions are made together with

state officials or with significant state aid.  *See Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1264 (11th Cir. 2009), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012).  In interpreting the state action requirement, the Eleventh Circuit looks to "the principles of agency law and jurisprudence under 42 U.S.C. § 1983." *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1247 (11th Cir. 2005) (internal citation omitted).

There is no bright line rule for distinguishing between state action and purely private conduct, and "[o]nly in rare circumstances can a private party be viewed as a '[s]tate actor' for section 1983 purposes." *Rayburn ex rel. Rayburn v. Hogue,* 241 F.3d 1341, 1347 (11th Cir.2001) (quoting *Harvey v. Harvey,* 949 F.2d 1127, 1130 (11th Cir. 1992)).  However, when a claim requiring state action is based on the conduct of a private actor, "there must be proof of a symbiotic relationship between a private actor and the government that involves the torture or killing alleged in the complaint to satisfy the requirement of state action[.]" *Romero v. Drummond Co.*, 552 F.3d 1303, 1317 (11th Cir. 2008); *see also Sinaltrainal,* 578 F.3d at 1266 ("We demand allegations of a symbiotic relationship that involves the torture or killing alleged in the complaint to satisfy the requirement of state action.") (quotation marks and citation omitted); *Rayburn ex rel. Rayburn,* 241 F.3d at 1348 ("The Supreme Court has indicated that the symbiotic relationship must involve the specific conduct of which the plaintiff complains.") (quotation and citation omitted).  A plaintiff may also prove that relationship "by presenting evidence of the active participation of a single official." *Romero*, 552 F.3d 1303,

7

1317 (11th Cir. 2008) (finding the proof of a general relationship between the AUC and the Colombian government was "not enough" to establish state action because the state action was not linked to the "murders described in the complaint".).[2]

There is an abundance of evidence in this record that the BCB operated in a symbiotic relationship with Colombian state actors.  State actors actively supported the BCB's operations through intelligence sharing, weapons, and military uniforms. [D.E. 199 at ¶ 16-18].  State actors also turned a blind eye to the BCB's presence and the group's criminal acts due to bribes.  *Id*. at ¶ 17.  In fact, at the time of Mr. Estrada's killing, San Pablo residents considered state officials and the BCB to be the same entity because the organization controlled the operations of the state.  *Id*. at ¶ 22.  The BCB even maintained a payroll for payments to the military and police force.  *Id*. at ¶ 23.  While the Court could continue further, there is no need to do so when the record is plentiful with evidence that Defendant acted under color of law. The first requirement is therefore satisfied.

### C.   *Secondary Theories of Liability*

The next element looks to whether Defendant is secondarily liable for the killing of Mr. Estrada and the torture of Mrs. Calderon.  "[S]econdary or indirect theories of liability recognized by U.S. law are available for claims brought under

---

[2]     In *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n,* the Supreme Court identified several theories for finding color of law in a § 1983 action: whether the conduct resulted from the state's coercive power, whether the state provided significant encouragement, whether the private actor operated as a willful participant in joint activity with the state, whether the private actor is controlled by an agency of the state, whether the private actor was delegated a public function, and the degree of public entwinement between the state and the private actor.  531 U.S. 288, 296 (2001).

the TVPA." *Doe v. Drummond Co.*, 782 F.3d 576, 607 (11th Cir. 2015).  That is, the TVPA contemplates liability against those who did not "personally execute the torture or extrajudicial killing."  *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 458 (2012) *Aldana,* 416 F.3d at 1248 ("[T]he [TVPA] reaches those who ordered, abetted, or assisted in the wrongful act."); *see also Chowdhury v. Worldtel Bangladesh Holding, Ltd.*, 746 F.3d 42, 52 (2d Cir. 2014) (noting that agency law "can provide a theory of tort liability if a defendant did not personally torture the victim").

Plaintiffs say that Defendant is secondarily liable because (1) he aided and abetted BCB members to commit crimes, (2) he actively participated in a conspiracy to commit wrongful acts, and (3) he exercised command responsibility to kill and torture.  Before we turn to each theory of liability, we first consider whether there is sufficient evidence that Defendant killed Mr. Estrada and tortured Mrs. Calderon.

### *(1) Extrajudicial Killing*

An extrajudicial killing is defined under the TVPA as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples."  *Id.* at § 3(a).  For a deliberate killing to constitute an extrajudicial killing, the death must be "'deliberate' in the sense of being undertaken with studied consideration and purpose."  *Mamani v. Berzain*, 654 F.3d 1148, 1155 (11th Cir. 2011).  However, "the TVPA is not limited to coordinated attacks and targeted executions," because an extrajudicial killing is a "broad phrase

meant to encompass many types of purposeful killing." *Mamani v. Sanchez Bustamante*, 968 F.3d 1216, 1233 (11th Cir. 2020).

On July 16, 2011, Defendant and Mrs. Calderon were walking home. [D.E. 199 at ¶ 57]. When the couple was two blocks away from their residence, a paramilitary member shot Mr. Estrada in the back of the head pursuant to the BCB's *modus operandi* for killings in urban areas. The sound of the bullet was so loud that Mrs. Calderon fell to the ground and lost consciousness. *Id*. at ¶ 59. When Mrs. Calderon regained consciousness, she noticed the paramilitary member standing over her before casually walking away. Mrs. Calderon screamed for help but Mr. Estrada was unresponsive. *Id*. at ¶ 61-62. Shortly thereafter, Mr. Estrada's brother arrived on the scene where he and others transported Mr. Estrada to a hospital where medical personnel pronounced him dead. *Id*. at ¶ 63. Although the BCB targeted Mr. Estrada within an earshot of a local police station, no officers inquired about the gunshots or screaming, and the same is true with the local military personnel. *Id*. at ¶¶ 64-66.

Mr. Estrada's death falls into the "clearly deliberate" category of extra judicial killings because the underlying acts were coldblooded and calculated. *See Mamani*, 968 F.3d at 1232–33 ("Some killings are clearly 'deliberate' in the sense that they are coldblooded, calculated, premeditated schemes designed to cause certain death."). This case is comparable, in some respects, to the 1998 embassy bombings in Kenya and Tanzania because both "involved substantial preparation, meticulous timing, and coordination[.]" *Owens v. Republic of Sudan*, 864 F.3d 751,

10

770 (D.C. Cir. 2017), *vacated and remanded on other grounds sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601, 1607 (2020) (citing *Mamani*, 654 F.3d at 1155). The act here also resembles the meticulous deliberation that took place in *Cabello v. Fernandez-Larios*, 402 F.3d 1148 (11th Cir. 2005), where the Eleventh Circuit upheld a jury's verdict on a TVPA claim where there was evidence that a defendant selected and reviewed a file before ordering the death of a political prisoner.

The same deliberation is present here because the evidence shows that Defendant and the BCB specifically targeted Mr. Estrada, hired a hitman to kill him, and did so under their own authority without any judicial authorization. This meets every element of an extrajudicial killing because the underlying act was "purposeful," "not caused by 'accidental or negligent' behavior," and "not the result of just provocation or sudden passion." *Mamani*, 968 F.3d at 1235 ("We hold that, to demonstrate a 'deliberated killing' here, Plaintiffs must present some evidence that their relatives' deaths were the result of a purposeful act to take another's life and that the deaths were not caused by 'accidental or negligent' behavior or other external circumstances and were not a result of just provocation or sudden passion."). Because Plaintiffs have sufficient evidence that the death of Mr. Estrada qualifies as an extrajudicial killing, we turn to whether Defendant tortured Mrs. Calderon.

### *(2) Torture*

The TVPA provides that "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation . . . subjects an individual to torture

shall, in a civil action, be liable for damages to that individual[.]"  28 U.S.C. §

1350 note § 2(a)(1).  The TVPA defines torture as follows:

> [A]ny act, directed against an individual in the offender's custody or
> physical control, by which severe pain or suffering (other than pain or
> suffering arising only from or inherent in, or incidental to, lawful
> sanctions), whether physical or mental, is intentionally inflicted on
> that individual for such purposes as obtaining from that individual or
> a third person information or a confession, punishing that individual
> for an act that individual or a third person has committed or
> is suspected of having committed, intimidating or coercing that
> individual or a third person, or for any reason based on discrimination
> of any kind; and
> . . .
> mental pain or suffering refers to prolonged mental harm caused by or
> resulting from—
> (A) the intentional infliction or threatened infliction of severe physical
> pain or suffering;
> (B) the administration or application, or threatened infliction of severe
> physical pain or suffering;
> (C) the threat of imminent death; or
> (D) the threat that another individual will imminently be subjected to
> death, severe physical pain or suffering, or the administration or
> application of mind altering substances or other procedures calculated
> to disrupt profoundly the senses or personality.

TVPA, § 3(b).

The requirement that the acts in question reach a certain level of severity "is

crucial to ensuring that the conduct proscribed by . . . the TVPA is sufficiently

extreme and outrageous to warrant the universal condemnation that the term

'torture' both connotes and invokes."  *Price v. Socialist People's Libyan Arab

Jamahiriya*, 294 F.3d 82, 92 (D.C. Cir. 2002).  "The critical issue is the degree of

pain and suffering that the alleged torturer intended to, and actually did, inflict

upon the victim."  *Id*. at 93.  "The more intense, lasting, or heinous the agony, the

more likely it is to be torture."  *Id*.  "This understanding thus makes clear that

torture does not automatically result whenever individuals in official custody are subjected even to direct physical assault." *Id*.

The record here establishes torture because Mrs. Calderon was forced to witness a BCB paramilitary member shoot her spouse in the back of the head, and she lost consciousness as a result.  When Mrs. Calderon regained consciousness, she witnessed the murderer standing over her with a gun in his hand and, fearing for her own life stayed quiet, while she watched Mr. Estrada bleed to death.  This meets every element of torture because the BCB paramilitary member physically assaulted Mrs. Calderon resulting in severe physical pain for herself and a fear of imminent death as she watched her spouse bleed to death next to her on the ground.  The evidence further supports a finding of torture because, in killing Mr. Estrada with a shot to the back of the head, Ms. Calderon now suffers from ongoing mental and physical suffering.  And these facts are equally as extreme if not more so than prior cases where the Eleventh Circuit has found torture.  *See, e.g., Jean–Pierre v. U.S. Attorney General,* 500 F.3d 1315, 1324 n.6 (11th Cir. 2007) (noting that electric shock can constitute torture within the meaning of the 1984 United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), Dec. 10, 1984, S. Treaty Doc. No. 100–20, 1465 U.N.T.S. 85, the multilateral international convention upon which the TVPA was based).  Because the undisputed evidence supports a finding of torture and an extra judicial killing, we turn to Plaintiffs' three theories of secondary liability.

### *(3) Aiding and Abetting*

The first theory for secondary liability is premised on aiding and abetting.  To prove indirect liability for aiding and abetting, Plaintiffs must prove "active participation" by a preponderance of the evidence.[3]  *See Cabello*, 402 F.3d at 1158.  "Liability for 'active participation' is supported if the wrongful act at the center of the claim is, in fact, committed, and the defendant gave knowing substantial assistance to the persons who committed the wrongful act.*"  Drummond Co.*, 782 F.3d at 608 (citing *Halberstam v. Welch*, 705 F.2d 472, 478 (D.C. Cir. 1983) (aiding and abetting liability "focuses on whether a defendant knowingly gave 'substantial assistance' to someone who performed wrongful conduct.")).

Plaintiffs meet every element of an aiding and abetting theory because Defendant indirectly ordered BCB members to kill Mr. Estrada.  The record shows, for example, that Defendant knew of the BCB's pattern of killing people, that he issued orders for the purpose of silencing critics of the organization, and that he met personally with zone commanders to evaluate regions under his control.  [D.E. 199 at ¶¶ 30-31].  It further establishes that Defendant oversaw regulations that

---

[3]     For a full set of the aiding and abetting elements, the Eleventh Circuit follows the standard set forth in *Halberstam* where the D.C. Circuit requires:

> (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation."

*Halberstam*, 705 F.2d at 477; *see also Drummond Co.*, 782 F.3d at 608 ("Although we explicitly cited *Halberstam* for conspiracy liability, we clearly incorporated and applied *Halberstam's* aiding and abetting standards as well.").

labelled critics of the BCB as military targets for murder and that he issued orders to eliminate approximately 1300 people, including Mr. Estrada. Given this evidence where Mr. Estrada's death was a foreseeable result of Defendant's actions and where Defendant directed zone commanders to murder civilians, Plaintiffs have established every element of an aiding and abetting theory.

### (4) Conspiracy

The next theory of secondary liability is conspiracy. To prove indirect liability for conspiracy, Plaintiffs must "prove by a preponderance of the evidence that (1) two or more persons agreed to commit a wrongful act, (2) [a defendant] joined the conspiracy knowing of at least one of the goals of the conspiracy and intending to help accomplish it, and (3) one or more of the violations was committed by someone who was a member of the conspiracy and acted in furtherance of the conspiracy." *Cabello*, 402 F.3d 1148, 1159 (11th Cir. 2005) (citing *Halberstam*, 705 F.2d at 481, 487). "[P]arallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

The evidence here fully supports a conspiracy theory of liability because Defendant founded the BCB, used it to combat the illegal drug trade and guerilla forces, and accomplished that goal through a practice of instructing paramilitary members to murder civilians. [D.E. 199 at ¶ 2]. In other words, the evidence meets every element of a conspiracy theory because Defendant joined with 7,000 paramilitary members for the purpose of controlling drugs and accomplished that

objective through a campaign of targeted violence.  The undisputed evidence is therefore sufficient to establish a conspiracy.

### (5) Command Responsibility

The final theory of secondary liability relies on the doctrine of command responsibility. Although this doctrine is not explicitly stated in the TVPA, the Eleventh Circuit incorporates the concept through the statute's legislative history. *See Ford*, 289 F.3d at 1286 (quoting S. Rep. No. 102–249 at 9 (1991) ("[R]esponsibility for torture, summary execution, or disappearances extends beyond the person or persons who actually committed those acts anyone with higher authority who authorized, tolerated or knowingly ignored those acts is liable for them")).  "An examination of legislative history indicates that the TVPA was intended to reach beyond the person who actually committed the acts, to those ordering, abetting, or assisting in the violation." *Cabello,* 402 F.3d at 1157; *see also Aldana,* 416 F.3d at 1248 ("The [TVPA] reaches those who ordered, abetted, or assisted in the wrongful act").

This doctrine "makes a commander liable for acts of his subordinates, even where the commander did not order those acts, when certain elements are met." *Ford v. Garcia,* 289 F.3d 1283, 1286 (11th Cir. 2002).  The elements for this doctrine include: "(1) the existence of a superior-subordinate relationship between the commander and the perpetrator of the crime; (2) that the commander knew or should have known, owing to the circumstances at the time, that his subordinates had committed, were committing, or planned to commit acts violative of the law of

war; and (3) that the commander failed to prevent the commission of the crimes, or failed to punish the subordinates after the commission of the crimes." *Id.* The doctrine applies not only in "wartime," but also in "peacetime." *Hilao v. Estate of Marcos,* 103 F.3d 767, 777 (9th Cir. 1996).

To establish the first element and a "superior-subordinate relationship", Plaintiffs must show that Defendant had "effective control" over the soldiers who killed Mr. Estrada. *Ford,* 289 F.3d at 1290. The concept of "effective control" includes "a material ability to prevent or punish criminal conduct," regardless of how that control is exercised. *Id.* (citation and internal quotation marks omitted). Effective control, for instance, may be "*de facto* or *de jure.*" *Id.* at 1291 (citation omitted). Where a commander has "*de jure* authority" over the perpetrators of the underlying crime, such authority is "*prima facie* evidence of effective control." *Id.* (citation omitted).

The first element is satisfied because the record shows that Defendant exercised total control over all lower-ranking paramilitary members in the BCB. [D.E. 199 at ¶ 26]. Defendant's power included, among others, the designation, removal, or transfer of zone commanders, and the creation, dissolution, and merger of zones. Defendant also had the power to punish a subordinate with death for failing to carry out the orders of a superior officer. *See id.* at ¶ 26. This shows that Defendant had not only effective control but *complete authority* over the killings in San Pablo because he stood at the top of the BCB's hierarchical structure where

every command flowed downward.[4]  *See Doe v. Qi*, 349 F. Supp. 2d 1258, 1331-32 (N.D. Cal. 2004) (finding that a superior subordinate relationship was established where one defendant had supervisory authority over perpetrators, and another defendant "played a major policy-making and supervisory role in the policies and practices that were carried out") (internal quotation marks omitted).   Because Defendant exercised total control over the subordinates in the BCB and a superior-subordinate relationship only requires "effective *control* over a subordinate in the sense of a material ability to prevent or punish criminal conduct, *however that control is exercised,*" the first element is well established.  *Ford,* 289 F.3d at 1290 (emphasis added).

---

[4]     A *de jure* superior-subordinate relationship exists for purposes of the command responsibility doctrine when "the superior has been appointed, elected or otherwise assigned to a position of authority for the purpose of commanding or leading other persons who are thereby to be legally considered his subordinates."  Guénaël Mettraux, *The Law of Command Responsibility* at 139 (2009).  A formal title or position of authority is insufficient to establish a superior-subordinate relationship; rather, "any inference concerning the relationship of subordination" must be "accompanied by the powers and authority normally attached to such a role."  *Id.* at 141.  A defendant in a position of *de jure* authority exercises effective control over his subordinates when he "was effectively able to enforce his legal authority through the exercise of his legal powers over the perpetrators."  *Id.* at 174.

On the other hand, a *de facto* superior-subordinate relationship exists under the command responsibility doctrine when "one party—the superior—has acquired over one or more people enough authority to prevent them from committing crimes or to punish them when they have done so."  *Id.* at 142-43.  A *de facto* superior must be (1) "cognizant of his position vis-à-vis other persons whose conduct he is responsible for," and (2) "aware of the duties which his relationship with another person, or group of persons, implied for him (in particular, a duty to prevent and punish crimes) and must have accepted this role and responsibility, albeit implicitly.*"  *Id.* at 145.

The second element requires Plaintiffs to show that Defendant "knew or should have known, owing to the circumstances at the time," that soldiers "had committed, were committing, or planned to commit" extrajudicial killings. *Ford,* 289 F.3d at 1288. The evidence here is sufficient because the BCB implemented a policy of targeting civilians and perceived guerilla sympathizers. Plaintiffs have also shown that Defendant's subordinates committed approximately 1300 murders and mass killings under his command. And the evidence further establishes that Defendant personally ordered the killing of a Jesuit priest and that he assumed personal oversight over the murder of civilians. [D.E. 199 at ¶ 34]. This is more than sufficient to meet the second element because Defendant not only oversaw the entire organization but had personal knowledge and involvement of the underlying crimes. *See, e.g., Lizarbe v. Rondon,* 642 F. Supp. 2d 473, 491 (D. Md. 2009) (finding that a defendant had the requisite knowledge of his troops' alleged atrocities where he attended meeting about operations, oversaw firing on villagers and burning of homes, and set up blockade of escape routes); *Qi,* 349 F. Supp. 2d at 1332-33 (defendants had requisite knowledge of their subordinates' alleged human rights violations where "repression and abuse were widespread, pervasive, and widely reported," and both defendants "actively encouraged and incited the crackdown" on victims); *Xuncax v. Gramajo,* 886 F. Supp. 162, 173 (D. Mass. 1995) (defendant had requisite knowledge where "[w]hen confronted with the murder of innocent civilians by soldiers under his command," defendant did not

deny facts but instead said actions were "appropriate") (internal quotation marks omitted).

The final element of command responsibility requires Plaintiffs to prove that Defendant "failed to prevent" the extrajudicial killings or "failed to punish" the soldiers afterwards. *Ford,* 289 F.3d at 1288. There is no need to give this element much consideration because, for the reasons already stated, Defendant failed to take any steps to prevent or punish the commission of the crimes detailed above. *See, e.g., Arce v. Garcia,* 434 F.3d 1254, 1259 (11th Cir. 2006) (affirming judgment holding Minister of Defense and Director General of El Salvador National Guard liable for torture committed by their soldiers under the command responsibility doctrine); *Paul v. Avril,* 901 F. Supp. 330, 335 (S.D. Fla. 1994) (finding military ruler personally liable for "systematic pattern of egregious human rights abuses" carried out "under his instructions, authority, and control"). Indeed, the opposite occurred where Defendant formed a paramilitary organization that killed civilians, and he did nothing to prevent or punish the soldiers he directed. Plaintiff has therefore established all three elements to sustain a theory of liability for command responsibility.

### D.      *The Exhaustion of Local Remedies*

The next issue is whether summary judgment should be granted as to the exhaustion of local remedies. Subsection 2(b) of the TVPA states that a "court shall decline to hear a claim under this section if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the

claim occurred." 28 U.S.C. § 1350 note, § 2(b). "[T]he exhaustion requirement . . . to the TVPA is an affirmative defense, requiring the defendant to bear the burden of proof." *Jean v. Dorelien*, 431 F.3d 776, 781 (11th Cir. 2005) (citing cases). This is a substantial burden on defendants because "Plaintiffs . . . are entitled to a presumption that local remedies have been exhausted, which Defendants must overcome before Plaintiffs are required to prove exhaustion or, presumably, the futility of exhausting local remedies." *Sinaltrainal v. Coca-Cola Co.*, 256 F. Supp. 2d 1345, 1357 (S.D. Fla. 2003); *see also Enahoro v. Abubakar*, 408 F.3d 877, 892 (7th Cir. 2005) ("[T]o the extent that there is any doubt[,] . . . both Congress and international tribunals have mandated that such doubts [concerning the exhaustion of remedies under the TVPA] be resolved in favor of the plaintiffs."); *Wiwa v. Royal Dutch Petroleum Co.*, 2002 WL 319887, at *17–18 (S.D.N.Y. Feb. 28, 2002) (raising exhaustion of remedies under the TVPA as an affirmative defense did not satisfy the initial burden of demonstrating that plaintiffs had not exhausted "alternative and adequate" remedies in Nigeria). Ultimately, to prevail on an exhaustion defense, a defendant must demonstrate that a plaintiff failed to exhaust all "adequate and available" remedies:

> Once [a defendant] makes a showing of remedies abroad which have not been exhausted, the burden shifts to [the plaintiff] to rebut by showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile. The ultimate burden of proof and persuasion on the [exhaustion defense], however, lies with [the defendant].

*Jean*, 431 F.3d at 782 (quoting S. Rep. No. 249, 102d Cong., 1st Sess., at 9-10 (1991)).

In failing to file a response to the pending motion for summary judgment, Defendant produced no evidence that Plaintiffs failed to exhaust local remedies. That alone is dispositive of the exhaustion issue because Defendant had the initial burden to raise an issue of fact on exhaustion and he failed to do so. *See Jara v. Nunez*, 2016 WL 2348658, at *3 (M.D. Fla. May 4, 2016) ("The Exhaustion defense is an affirmative defense for which Defendant bears a 'substantial' burden of proof.") (citing *Jean*, 431 F.3d at 781). In any event, there is evidence that Plaintiffs exhausted local remedies because they sought relief through Colombia's criminal justice system and the Colombia Justice and Peace Process. [D.E. 199 at ¶ 73]. Those efforts have, of course, been fruitless because there has been no responsibility for a murder that took place almost 20 years ago. But, given that Plaintiffs exhausted local remedies, presented evidence to that effect despite not having the initial burden to do so and Defendant failed to offer anything in response, Plaintiffs are entitled to summary judgment with respect to this affirmative defense.

### E.   *Compensatory and Punitive Damages*

Having now established that Defendant is liable as a matter of law for the extrajudicial killing of Mr. Estrada and the torture of Mrs. Calderon, the final issue is damages. The TVPA provides that a defendant is "liable for damages to the individual's legal representative, or to any person why may be a claimant in an action for wrongful death." TVPA § 2(a)(2). Plaintiffs ask for a substantial yet unspecified amount in compensatory and punitive damages because of the egregious

conduct detailed above, the long-lasting injuries to Mrs. Calderon, and the need to punish and deter Defendant from similar abuses.

The language of the TVPA provides no methodology for determining an amount or type of damages. *See Xuncax*, 886 F. Supp. at 198 ("The TVPA does not itself provide any specific guidance regarding the amount of recovery to which a successful litigant under the statute is entitled. Rather, the TVPA leaves to the federal courts the task of determining the proper measure of liability."). But, "federal courts are free to and should create federal common law to provide justice for any injury contemplated by . . . the TVPA or treaties dealing with the protection of human rights." *In re Est. of Marcos Hum. Rts. Litig.*, 910 F. Supp. 1460, 1469 (D. Haw. 1995) (citing *Textile Workers Union of America v. Lincoln Mills of Alabama*, 353 U.S. 448, 457 (1957) ("Some [problems] will lack express statutory sanction but will be solved by looking at the policy of the legislation and fashioning a remedy that will effectuate that policy.")). Since federal common law allows for the recovery of compensatory and punitive damages, courts frequently award both remedies for TVPA violations. *See Chiminya Tachiona v. Mugabe*, 216 F. Supp. 2d 262, 267 (S.D.N.Y. 2002) (stating that in "regards [to] the TVPA, the federal common law concerning damage awards allows for both compensatory and punitive damages in the amounts requested by Plaintiffs.") *see also Mushikiwabo v. Barayagwiza*, 1996 WL 164496, at *3 (S.D.N.Y. Apr. 9, 1996) (awarding compensatory damages including $500,000 in pain and suffering and awarding $1,000,000 in punitive damages to each relative of a victim and $5,000,000 to each

victim for torture and murder under the TVPA and ATCA); *Xuncax*, 886 F. Supp. at 198 (awarding compensatory and punitive damages under the TVPA because "damages for torture and related abuse in violation of international law and sufficiently comparable to the claims presented here by plaintiff Ortiz have been awarded in a number of federal cases predating the TVPA.").[5]

Notwithstanding the difficulty in calculating a damages award, "[c]ourts typically consider a number of factors in awarding damages under the . . . TVPA: (1) the brutality of the act; (2) the egregiousness of the defendant's conduct; (3) the unavailability of a criminal remedy; (4) international condemnation of the act; (5) deterrence of others from committing similar acts; and (6) provision of redress to plaintiff, country, and world. *Id.* at *7 (citing *Doe v. Saravia,* 348 F. Supp. 2d 1112, 1158 (E.D. Cal. 2004)). It should be understood, however, that these factors are not dispositive and that courts award damages based on the circumstances of each case. The reason for this variance is due to the difficulty in calculating a damage award in the first place. When plaintiffs seek relief for TVPA violations, they ask courts to attach a monetary amount to a violation of basic human rights. Yet, that is no easy feat because the loss is almost always immeasurable.

---

[5]     The Eleventh Circuit follows the same approach and has affirmed compensatory and punitive damage awards in TVPA cases despite silence in the statute itself. *See, e.g.*, *Cabello*, 402 F.3d at 1151 (affirming a jury verdict in a TVPA case that awarded survivors "an award of $3 million dollars in compensatory damages and $1 million dollars in punitive damages.").

Plaintiffs first seek an unspecified amount in compensatory damages.[6]  There is no question that the brutal crimes here entitle each plaintiff to the relief requested.  Mr. Estrada lost his life because of Defendant's conduct, and his family members suffer tremendously due to his loss.  Mr. Estrada's brother describes his life as shattered and carries the pain of that day with him despite counseling and therapy.  Mrs. Calderon also suffers because, as a first-hand witness to Mr. Estrada's murder, she has mental anguish for a crime that, in her words, "will forever haunt" her.  [D.E. 198 at ¶ 51].  The facts of this care are thus sufficient to entitle each plaintiff to compensatory damages.  The only question left is what that monetary amount should be.

But, before turning to that question, Plaintiffs are also entitled to punitive damages.  Unlike compensatory damages, punitive damages are designed to punish and deter others from committing similar abuses.  "To accomplish that purpose," courts "make clear the depth of the international revulsion against torture and measure the award in accordance with the enormity of the offense." *Filartiga v. Pena-Irala*, 577 F. Supp. 860, 866 (E.D.N.Y. 1984).  The Supreme Court has provided guidance on how to determine a reasonable punitive damages award,

---

[6]  Compensatory damages "are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 432 (2001) (citing Restatement (Second) of Torts § 903, pp. 453–454 (1979)).  This is noticeably different than punitive damages which serve the two goals of deterrence and retribution.  *See id.*; *see also Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 19 (1991) ("[P]unitive damages are imposed for purposes of retribution and deterrence").

listing several factors for courts to consider.  These include reprehensibility[7], "the disparity between the harm or potential harm suffered," and the "difference between this remedy and the civil penalties imposed in comparable cases."  *BMW of North America Inc. v. Gore,* 517 U.S. 559, 575 (1996) (citations omitted).  However, "the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct."  *Id.*

Plaintiffs are entitled to punitive damages because the crimes committed were malicious, wanton and reckless.  *See Cabello v. Fernandez-Larios*, No. 99-0528-CIV-LENARD (S.D. Fla. Oct. 14, 2003), *aff'd*, 402 F.3d 1148 (11th Cir. 2005) ("You may award punitive damages to the plaintiffs if they have proven that the defendant's conduct was wanton and reckless").  Defendant led an organization that executed entire families and he encouraged a policy of murdering civilians.   His actions also silenced dissent and resulted in the deaths of approximately 1300 individuals, including Mr. Estrada.  And this does not even consider the untold hurt and suffering of those that survived Defendant's acts like Mrs. Calderon.  Given all

---

[7]     Evidence of repeated misconduct is relevant in fashioning an appropriate punitive damage award because it looks to reprehensibility:

> Certainly, evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law. . . . Our holdings that a recidivist may be punished more severely than a first offender recognize that repeated misconduct is more reprehensible than an individual instance of malfeasance.

*BMW of N. Am., Inc.*, 517 U.S. at 576.

the factors enumerated above and the undisputed evidence presented, Plaintiffs are entitled to a substantial punitive damages award.

The final question is the amount of compensatory and punitive damages. Plaintiffs never propose an amount for the Court to consider.  They only say that the damages award should be substantial.  [D.E. 198 at ¶ 53 ("This Court should find that substantial compensatory damages, including damages for Plaintiffs' pain and suffering, are appropriate given the serious harm caused by the extrajudicial killing and torture for which Defendant is responsible."); *id.* at ¶ 58 ("The record in this case clearly establishes an evidentiary basis for a substantial punitive damages award.").

While the Court would have preferred a specific dollar amount, the undersigned has taken a careful review of similar cases where plaintiffs have recovered compensatory and punitive damages for international rights abuses.  *See, e.g.*, *Xuncax,* 886 F. Supp. at 198 (victims of summary execution awarded $2,000,000 in compensatory and $5,000,000 in punitive damages each; torture victims awarded $1,000,000 in compensatory damages and $2,000,000 in punitive damages); *Paul v. Avril,* 901 F. Supp. 330, 335 (S.D. Fla. 1994) (six victims of torture and arbitrary detention each awarded between $2,500,000 and $3,500,000 in compensatory damages and $4,000,000 in punitive damages); *Forti v. Suarez,* (N.D. Cal. April 25, 1990) (for arbitrary detention, torture, abuse, and execution of brother, $3,000,000 in compensatory, $3,000,000 in punitive); *Siderman v. Argentina*, 1984 WL 9080 (C.D. Cal. Sept. 28, 1984) (for

torture, compensatory damages of $2,607,575.63), *vacated on other grounds,* (C.D. Cal. March 7, 1985); *Quiros de Rapaport, et al., v. Suarez–Mason,* No. C87–2266 JPV (N.D. Cal. April 11, 1989) (for torture and murder of one victim and disappearance of another, court awarded $10,000,000 in compensation and $10,000,000 in punitive damages to victims' widows and $5,000,000 in compensation and $5,000,000 in punitive damages to victims' mother and sister).

Based on these decisions and the cases referenced in the motion for summary judgment[8], the Mr. Estrada's estate and Mrs. Calderon are each entitled to a sum of $2 million dollars in compensatory damages and $4 million dollars in punitive damages. This amount reflects a reasonable recovery for the facts of this case and the pain and suffering. Accordingly, Plaintiffs' motion for summary judgment is **GRANTED** with a total damage award of $12 million dollars.

## IV. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that Plaintiffs' motion for summary judgment [D.E. 198] is **GRANTED**.

   A.   Mrs. Calderon and Mr. Gutierrez are each entitled to $2 million dollars in compensatory damages and $4 million dollars in punitive damages.

   B.   Defendant is liable for a total damage award of $12 million dollars.

   C.   Final Judgment shall be entered against Defendant.

---

[8]   In their motion for summary judgment, Plaintiffs reference an abundance of cases awarding compensatory and punitive damages. Although the undersigned declines to reference them all here, the Court carefully reviewed each of them.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 28th day of September, 2021.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge